UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION - BAY CITY

IN RE:

    CARRIE ANNE HODGES,　　　　　　　　　　Case No. 14-21561-dob
        Debtor.　　　　　　　　　　　　　　　　Chapter 7 Proceeding
　　　　　　　　　　　　　　　　　　　　　　　　Hon. Daniel S. Opperman
_____/

FAMILY FIRST CREDIT UNION,
        Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　　Adversary Proceeding
　　　　　　　　　　　　　　　　　　　　　　　Case No. 14-2102-dob
CARRIE ANNE HODGES,
        Defendant.
_____/

## TRIAL OPINION

### Introduction

The Plaintiff, Family First Credit Union, seeks a determination from this Court that a debt or a portion of the debt owed to it by the Defendant, Carrie Anne Hodges, is excepted from discharge pursuant to 11 U.S.C. § 523. The Defendant contests and disputes the Plaintiff's request for relief. The Court held a trial on November 12 and 13, 2015, and granted the Defendant's partial motion to dismiss the Plaintiff's Section 523(a)(2) count, leaving just the Section 523(a)(6) count. The Court recommenced the trial on December 18, 2015, and concluded the trial on that date. During the course of the trial, the Court heard testimony from Larry Weaver and Jan Hoffman (neighbors of the Defendant), John Stemple, Larry VanWert, Dennis Zehnder, Judy Corbin (the Credit Solutions and Recovery Manager of Family First Credit Union), and the Defendant. The Court also admitted Exhibits 1, 4-6, 8, and 10-15. Exhibit 3 was admitted in part. The Court issues this Opinion after careful consideration of the testimony, exhibits, arguments of the parties, and the Defendant's supplemental pleading filed on December 31, 2015.

1

## Findings of Fact

The Defendant, Carrie Anne Hodges, (the "Defendant") purchased a home at 316 South Wheeler, Saginaw, Michigan, in 1992 and began living there with her boyfriend. After a few years of living at 316 South Wheeler with her boyfriend, the Defendant decided to refinance her mortgage with the Plaintiff, Family First Credit Union (the "Plaintiff") . To that end, the Defendant applied for, sought, and obtained a loan from the Plaintiff that closed in 1998. Per the implied conditions of her loan application, the Defendant had improvements made to 316 South Wheeler except for the demolition and reconstruction of a new garage. Many of these improvements were made by the Defendant's father, who, along with the Defendant's brother, generally maintained the Defendant's home. Both gentlemen are skilled in the construction trades. As the Defendant testified, she felt very strongly about her home, and at various times during her testimony described it as her "dream home."

Although 316 South Wheeler may have been the Defendant's "dream home" her neighbors thought otherwise. Per the testimony of Mr. Weaver and Ms. Hoffman, the Defendant and her friends and family often had loud parties, were not friendly, and did not tend to the lawn and out-lot at 316 South Wheeler. Additionally, the Defendant owned several dogs from 1992-2009 and did not tend to the clean up of the dog waste regularly, but only on a periodic and irregular basis. As a result, the smell from 316 South Wheeler was odorous to adjoining neighbors and caused them much angst.

By late fall of 2006, the Defendant was experiencing problems with her furnace, which gave her greater concern because she was also pregnant. She gave birth to her daughter in December of 2006, but did not return to 316 South Wheeler after her daughter was born. Instead, the Defendant lived with her parents for a short period of time while certain rooms were being remodeled at her grandfather's home on Malzahn Street, a few blocks away from 316 South Wheeler. The Defendant

moved to the Malzahn Street address in spring of 2007, but left some furniture and clothes at 316 South Wheeler, along with her four dogs, a St. Bernard, two Siberian Huskies, and a Lab/Chow. From December of 2006 through February of 2009, these four dogs lived, for the most part, unattended at 316 South Wheeler. Per the testimony of the Defendant, she had someone, usually her father or brother, visit 316 South Wheeler once or possibly twice a day to let the dogs out into the yard and then feed and water the dogs. In better weather, the dogs were allowed unrestricted access to the backyard through the back porch. By implication, on bad weather days, the four dogs were inside 316 South Wheeler for the vast majority of the day. Unless an individual dog walked outside, that dog stayed in the home at 316 South Wheeler from December of 2006 through February of 2009. The February 2009 removal of the dogs was a result of an inspection by Mr. Stemple, the Development Coordinator of the City of Saginaw. Mr. Stemple, who the Court found to be a credible witness, testified that he inspected the Defendant's home at 316 South Wheeler on January 5, 2009, and found that the home was not being used as a single family residence, but instead was a shelter for the four dogs. Mr. Stemple testified that he noted a strong animal waste odor in the home, the floor covering had been removed, and the sub-floor was exposed to animal waste. He also noted that some furniture, such as a sofa, had been shredded by the dogs and that in his opinion any material of an absorbent nature, such as plaster, insulation, or wood was fouled by the dog waste and would need to be removed. Mr. Stemple, who has experience as a coordinator of demolishing homes in the City of Saginaw, reviewed 316 South Wheeler and determined that the cost to repair and replace the fouled portions of the home far exceeded the value of the home located at 316 South Wheeler.

Mr. Stemple also noted that in 2011, the water department records indicated a significant spike in the usage of the water, which is suggestive of a water line break.

The Defendant's neighbors, Mr. Weaver and Ms. Hoffman, confirmed Mr. Stemple's

3

observation of the smell and waste at 316 South Wheeler. Ms. Hoffman, who lives next door to 316 South Wheeler, testified that the stench from 316 South Wheeler was so strong that she often had to move from one side of her home to the other with very little relief afforded by that move. Mr. Weaver confirms the smell emanating from 316 South Wheeler, both from the home and the yard.

From 1999 through 2008, the Defendant made generally regular payments on her mortgage note obligation to the Plaintiff. Her note became due in October of 2008, and she renewed her obligation with the Plaintiff and continued making payments to the Plaintiff at a slightly higher monthly payment amount. The Defendant made these monthly payments even though she continued to live at the Malzahn Street home. It was not until her grandfather passed away and her mother, who inherited the Malzahn Street home, required her to make $200 per month payments, that the Defendant began experiencing financial difficulties in making the rent payment for the Malzahn Street home and the mortgage payment to the Plaintiff on 316 South Wheeler. By mid 2013, the Defendant was no longer able to make these payments and defaulted on her mortgage note with the Plaintiff. Per the Defendant's testimony, she visited 316 South Wheeler between three to four times a year to check its status. Shortly thereafter, the Plaintiff began investigating the status of 316 South Wheeler and learned of its deplorable condition.[1]

On one of the visits, a number of photographs were taken depicting the condition of 316 South Wheeler. These photographs, admitted as Exhibit 8, depicted deplorable conditions of the home and show evidence of abuse, misuse, and damage by the dogs, along with water damage.

---

[1] At trial, the Defendant testified that the former Chief Executive Officer of Family First Credit Union and possibly another person visited 316 South Wheeler prior to 2013. Ms. Corbin could not find any record of such a visit and the Defendant's testimony was vague and ambiguous as to the nature of this visit. The Defendant's supplement speculates that the Plaintiff's representative must have visited 316 South Wheeler in 2013 because an inspection was necessary to have the Plaintiff agree to lend the Defendant additional money. Perhaps so, but the damage done to 316 South Wheeler occurred between 2007-2009 as to the dogs and 2011 as to the water. The Court does not find the Defendant's testimony regarding this possible earlier visit to be credible or relevant.

4

Some photographs depict stains on the floor and ripped sofas; others depict the buckling of the floor caused by the excessive amount of water and humidity in the home. The Defendant testified that she was aware of the buckling of the floor and the cause of it, which she attributed to a water line break, but had no explanation as to why she did not make an insurance claim for this damage, other than to explain that she did not want anyone to know that she was not living in the home for fear that the insurance coverage at 316 South Wheeler would have been canceled, and as stated in her supplement, violate her mortgage contract with the Plaintiff.

As early as 2009, starting with Mr. Stemple's January of 2009 visit through 2014, all visitors describe 316 South Wheeler as in extremely poor condition with a strong scent of dog waste and urine. Some, such as Mr. VanWert, questioned whether it was safe to continually inhale the air at 316 South Wheeler. All of these individuals, namely Mr. Stemple, Mr. VanWert, and Ms. Corbin, agree as to the nature and the extent of the smell and damage caused by the dogs and, to a lesser but different extent, water damage caused from the water line break and the roof leak near the back porch and kitchen area. The neighbors, Mr. Weaver and Ms. Hoffman, agree with the assessment of these individuals, but lacked the experience of being inside 316 South Wheeler. Instead, their experience was from smelling the area nearby.

The Defendant, on the other hand, did not notice such a smell, other than to describe the smell as "musty" or similar to a home that had not been opened for some time. The Defendant does acknowledge the current condition of 316 South Wheeler, but attributes that condition to the invasion of other animals and people into her "dream home."

Mr. VanWert testified that in his view, the property at 316 South Wheeler revealed that the entire flooring and sub-flooring would need to be removed, but that the nature of the damage to the home was such that it would not be possible to renovate the home economically. Mr. VanWert testified that he inspects approximately 500 homes per year and that 316 South Wheeler was the

worst home he had inspected during this time.  Mr. Van Wert concluded that it would cost approximately $100 per square foot to renovate the home, a number far in excess of the value of the home, which Mr. Zehnder, a licensed broker, testified had a value of approximately $25 per square foot.  In that regard, Mr. Zehnder, who was called as an expert witness to testify as to the value of a home like that at 316 South Wheeler without the damage, opined that the market value of such a home would be between $20-$25 per square foot and that he estimated the square footage of 316 South Wheeler to be between 1,100-1,200 square feet.  Mathematically, therefore, Mr. Zehnder testified that the normal value of a home like that at 316 South Wheeler would range between $27,500 ($25 per square foot x 1,100) to $30,000 ($25 per square foot x 1,200).

The Defendant testified that she kept the four dogs at 316 South Wheeler starting in December of 2006 because she was worried that someone would break into the home and that her grandfather would not let her have the dogs at the Malzahn Street home.  Later, however, she testified that she moved three of the dogs to the Malzahn Street home, but that those dogs were not allowed into the Malzahn Street home, but were instead restricted to the yard area.  While the Defendant testified that the four dogs may have stayed at 316 South Wheeler through 2010, the more credible evidence is that they were moved shortly after Mr. Stemple's January 6, 2009, letter setting a deadline of February 16, 2009.  While it is understandable that the Defendant might not recall specific dates, especially this many years after the fact, she also has a very poor recollection as to other events and dates, such as: the continued complaints of her neighbors about 316 South Wheeler; the details of a criminal misdemeanor complaint filed against her and a determination by the Saginaw County District Court regarding the condition of 316 South Wheeler; and her vague testimony that she visited 316 South Wheeler three to four times a year.  Also, when pressed as to the condition of the home as depicted in the Exhibit 8 pictures, the Defendant left open the possibility that someone either moved into her home, occupied her home, or that an animal or other

6

creature did so. The Defendant did testify consistently, however, that she did not tell anyone, other than her family, that 316 South Wheeler was not occupied by her after December of 2006, and that she had that concern of nondisclosure in mind when she decided to not call her insurance agent regarding the damage to 316 South Wheeler as a result of a water line break.

### Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1334, and E.D. Mich. LR 83.50. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts).

Recently, the United States Supreme Court has determined that so long as the parties knowingly and voluntarily consent, Article III allows bankruptcy judges to adjudicate certain claims. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932 (2015).

### Applicable Statute

### Section 523(a)(6)

Section 523(a)(6) authorizes a bankruptcy court to exclude a debtor from receiving a discharge "from any debt for willful and malicious injury by the debtor to another entity or the property of another entity." The exceptions to discharge are to be narrowly construed in favor of the debtor. *Monsanto Co., v. Trantham (In re Trantham)*, 304 B.R. 298 (B.A.P. 6th Cir. 2004) (citing *Meyers v. I.R.S. (In re Meyers)*, 196 F.3d 622 (6th Cir. 1999)); *see also Walker v. Tuttle (In re Tuttle)*, 224 B.R. 606, 610 (Bankr. W.D. Mich. 1998) (recognizing "the axiom that requires this court to construe exceptions to the bankruptcy discharge narrowly and in favor of the debtor.") (citing *Kawaauhau v. Geiger*, 523 U.S. 57 (1998)). A party must prove by a preponderance of the evidence that a debtor committed an injury that is both willful <u>and</u> malicious. *Grogan v. Garner*, 498 U.S. 279 (1991).

*Kawaauhau v. Geiger*, 523 U.S. 57 (1998) discussed and determined the meaning of the

7

language used in 11 U.S.C. § 523(a)(6). The issue before the United States Supreme Court involved "whether a debt arising from a medical malpractice judgment attributable to negligent or reckless conduct" fell within 11 U.S.C. § 523(a)(6). *Id*. at 59. The Kawaauhaus Court argued that the malpractice award fell within the Section 523(a)(6) exception because Dr. Geiger engaged in the intentional act of providing inadequate medical services which led to Mrs. Kawaauhau's injury. *Id*. at 61.

In analyzing the parameters of the language "willful and malicious injury," the United States Supreme Court found that:

> [T]he word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." . . . [T]he (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences of an act*," not simply "the act itself."

*Id.* at 61-62 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)).

The United States Supreme Court cautioned: place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended, i.e., neither desired nor in fact anticipated by the debtor. . . . A "knowing breach of contract" could also qualify. A construction so broad would be incompatible with the 'well-known guide that exceptions to discharge "should be confined to those plainly expressed.'
*Id*. at 62 (quoting *Gleason v. Thaw*, 236 U.S. 558, 562 (1915)).

More than a year later, the Sixth Circuit Court of Appeals considered the "willful and malicious injury" language contained in § 523(a)(6), in *Markowitz v. Campbell (In re Markowitz),* 190 F.3d 455 (6th Cir. 1999). The Sixth Circuit Court of Appeals interpreted *Geiger* and noted that:

8

> [t]he [Supreme] Court's citation to the Restatement's definition of "intentional torts" underscores the close relationship between the Restatement's definition of those torts and the definition of "willful and malicious injury." The Restatement defines intentional torts as those motivated by a desire to inflict injury or those substantially certain to result in injury. Although the Supreme Court identified a logical association between intentional torts and the requirements of § 523(a)(6), it neither expressly adopted nor quoted that portion of the Restatement discussing "substantially certain" consequences.

*Id.* at 464.

Based on the language used and analysis of the United States Supreme Court in *Geiger*, the *Markowitz* Court announced the standard of the Sixth Circuit Court of Appeals by holding that:

> unless 'the actor desires to cause [the] consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a "willful and malicious injury" as defined under § 523(a)(6).

*Id.* (quoting Restatement (Second) of Torts § 8A, at 15 (1964)); *see Kennedy v. Mustaine*, 249 F.3d 576, 580 (6th Cir. 2001).

In addition to proving a willful injury, a party must also prove that the debtor committed a malicious injury. "'Malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986) (citing *Tinker v. Colwell*, 193 U.S. 473, 486 (1904)). If a party fails to prove either element of willful or malicious, the debt will be discharged. *Markowitz*, 190 F.3d at 463. Inferences can be made, however, if the circumstances surrounding the alleged injury warrant such:

> Determining whether a debtor acted both willfully and maliciously for purposes of § 523(a)(6) requires an examination of that person's state of mind. A debtor will rarely, if ever, admit to acting in a willful and malicious manner . . . [but] both requirements can be inferred through the circumstances surrounding the [involved] injury.

*O'Brien v. Sintobin (In re Sintobin)*, 253 B.R. 826, 831 (Bankr. N.D. Ohio 2000) (citations omitted).

The *Kawaauhaus* Court's more encompassing interpretation could place within the excepted

category a wide range of situations in which an act is intentional, but injury is unintended, *i.e.*, neither desired nor in fact anticipated by the debtor. Every traffic accident stemming from an initial intentional act – for example, intentionally rotating the wheel of an automobile to make a left-hand turn without first checking oncoming traffic – could fit the description. *See* 113 F.3d at 852. A "knowing breach of contract" could also qualify. *Id.* A construction so broad would be incompatible with the "well-known" guide that exceptions to discharge "should be confined to those plainly expressed." *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915). The *Kawaauhaus* Court featured certain statements in the *Tinker* opinion, in particular: "[An] act is willful . . . in the sense that it is intentional and voluntary" even if performed "without any particular malice," *id.,* at 485, 24 S.Ct., at 508; an act that "necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously, so as to come within the [bankruptcy discharge] exception".

Analysis

The Court must first address a fundamental issue in a trial, the credibility of witnesses. In this case, the Court carefully observed the demeanor and listened to the testimony of all witnesses, but in particular, the Defendant. After doing so, the Court concludes and finds that the Defendant is not a credible witness. First, the Defendant is vague as to certain actions or inactions taken by her. Second, the Defendant often gave vague responses to questions that deserved a much more thoughtful and detailed reply. Third, the Defendant was the only individual who visited 316 South Wheeler from December of 2006 through December of 2013, and concluded that the smell from the dog waste was not strong, but instead that 316 South Wheeler only had a "musty" odor. This is in direct contradiction to the testimony of Ms. Corbin, Mr. VanWert, and Mr. Stemple. While it may be true that Ms. Corbin and Mr. VanWert are aligned with the Plaintiff, Mr. Stemple is not. While it is also true that Mr. Stemple's experience was as of 2009, it simply is beyond common sense to

10

conclude that a home that was inhabited by four dogs, essentially unattended, no matter how well housebroken, for over two years would not have a strong and distinct odor of canine waste.

The Court does weigh, on the other hand, the Defendant's monthly payment to the Plaintiff from December of 2006 through March of 2013, which gives weight to her credibility.  It is unexplainable why the Defendant continued to make payments during this time when she was not living in the home and, from February of 2009, the home was vacant.  This is especially true as the Defendant, on numerous occasions, described 316 South Wheeler as her home, or her "dream home."

That being the case, the Court does find persuasive that the failure of the Defendant to inquire about insurance coverage after the water line break in 2011 to be instructive.  The Defendant, when pressed, testified that she did not want to contact the insurance company because she did not want anyone to realize that the home was vacant.  Likewise, it runs counter to logic that 316 South Wheeler was the Defendant's "dream home."  The Defendant only visited 316 South Wheeler on three or four occasions per year from 2006 through 2013 when it was her "dream home."  Moreover, if the Defendant's assertions regarding the invasion of 316 South Wheeler are true, the Defendant did not take any actions to stop these acts.  The Court has weighed all these factors, and concludes that the Defendant's credibility is highly suspect and cannot be given the same weight as the other witnesses.  Moreover, it is not clear why the Defendant left 316 South Wheeler in December of 2006, but did not return to the home.  While it may be understandable that the Defendant, with a newborn, did not want to take the chance of a faulty furnace during a Michigan winter, that concern only exists until winter subsides, which is normally as early as April of each year.  In her Supplement, the Defendant states that she did not want to disrupt her family's life by moving back and forth.  If this was the case, this disruption seems lesser when compared to the daily requirement

to check on the Defendant's dogs and maintain two households in an arrangement where the Defendant did not live in her "dream home." Also, if the Defendant's assertions as to the invasion of 316 South Wheeler are to be believed, the Defendant's failure to secure and check on 316 South Wheeler are additional facts supporting the Court's conclusion. The Defendant did not take any action to try to repair the furnace, other than to ask her brother about how expensive it could be to repair it, nor did she return even when the furnace was not needed in the warmer months. While the Defendant at closing argument indicated that there was a concern with the leaking roof in the home, there is no evidence before the Court to give weight as to why the Defendant did not take some minor remedial steps to stop the leaking of that roof, especially given the expertise of her father and brother in the construction trades.

Turning to the elements of Section 523(a)(6), the Court concludes that the Defendant's lodging of four large dogs from December of 2006 through February of 2009, with minimal human contact, supervision, or care, constitutes sufficient acts to cause the Court to conclude that the Defendant desired to cause the consequence of her act, that being damage to 316 South Wheeler. Further, that the consequences of leaving four large dogs in such a condition for over two years at 316 South Wheeler is a consequence that was substantially certain to result from that act, that is significant and economically irreparable damage to 316 South Wheeler. Simply stated, the Court concludes that the Defendant knew that the unattended keeping of the four large dogs at 316 South Wheeler would result in damage to the floor, walls, and general structure to the home at 316 South Wheeler. Moreover, the Defendant let this condition continue while the dogs were at 316 South Wheeler and then failed to take any action whatsoever to completely clean up the waste and resulting damage after the dogs were removed. Compounding this is the Defendant's failure to adequately inspect and repair the home in regard to the furnace, water line break, and leaking roof.

12

14-02102-dob    Doc 71    Filed 01/25/16    Entered 01/25/16 13:06:20    Page 12 of 15

These unique facts cause the Court to conclude that the Defendant did intend a willful injury.

The Court has seriously considered whether the Court is really raising the actions and inactions described herein to the level of creating a non-dischargeable debt for a mere breach of contract, as described in *Kawaauhau*. The Court concludes that it is not. Here, the aggrieved acts, or lack of action, are not solely grounded on contract, but instead are a series of actions and inactions designed to damage and injure the collateral granted to the Plaintiff as security for repayment of its loan. In this case, there is more than just an intentional breach of contract in that the Defendant did not intend to make a payment, but instead the Defendant intended to take additional acts or refrain from taking acts, all of which caused a consequence of injury and damage to the Plaintiff.

The Plaintiff has also shown a malicious injury. As stated by the Sixth Circuit Court of Appeals in *Wheeler v. Laudani*, 783 F.2d 610 (6th Cir. 1986), a malicious injury is one that is in conscious disregard of ones duties or without just cause or excuse. There is no requirement of an ill will or specific intent. The Court does not find the Defendant's reason for leaving the four dogs at 316 South Wheeler for security purposes persuasive. First, there is no evidence that four dogs are required for security, especially when other methods would be available to accomplish the same result. Second, there is no reason why the four dogs needed to be at 316 South Wheeler after the weather was warmer and the Defendant could return to her "dream home." Third, the Defendant had a duty under the mortgage to not commit waste and, by leaving the four dogs at 316 South Wheeler unattended, breached that duty. The Court therefore concludes that the Plaintiff has met its burden of proof and that a portion of the obligation owed by the Defendant to the Plaintiff is excepted from discharge.

The Defendant's Supplement to her closing arguments filed on December 31, 2015 (Docket No. 70), raises the issue of the Plaintiff's failure to inspect 316 South Wheeler in October 1998 or

2013 after the Defendant defaulted in her payments to the Plaintiff. These are legitimate inquires by the Defendant and the Court has considered these points, but finds the Defendant's arguments unpersuasive. First, the Plaintiff's inspection in October 1998 would not disclose the damage inflicted by the dogs in 2007-2009 or the water damage afterward. Second, a summer 2013 inspection would have uncovered these conditions, but after all the damage was done. While a more robust inspection schedule would have disclosed the problems and conditions of 316 South Wheeler earlier, those inspections would not have necessarily stopped the damage caused by the Defendant.[2]

The Plaintiff has argued to the Court that the full amount owed to it should be excepted from discharge, but the Court rejects that measure of damages. Instead, the Court notes that the home at 316 South Wheeler, even if kept in pristine shape, would not be worth the debt owed against it as secured by a mortgage on that home. Unfortunately, as is the case in many situations in Michigan, the value of a home has dropped dramatically, a portion of the decline in the value of the home, therefore, has nothing to do with the Defendant's actions whatsoever. As testified by Mr. Zehnder, however, a home in good condition like that of 316 South Wheeler would have a value of anywhere from $27,500-$30,000. The Court picks the midpoint of this range, $28,750, as the damages sustained by the Plaintiff. That is the amount which is excepted from discharge in this case.

In doing so, the Court rejects the Defendant's mathematically accurate argument that the Defendant has paid the amount lent by the Plaintiff back in the form of installment payments over the years. While true, the Defendant ignores the interest due on the principal lent by the Plaintiff that the Defendant contractually agreed to pay. It is the time value of the principal, as well as the

---

[2] Ironically, the Court does see the issue of mortgagee or loan servicer inspections arise from time to time, but in the context of a mortgagor/debtor objecting to inspection fees for monthly or bi-weekly visits to the mortgage premises, all in the context of additional costs claimed against the mortgagor/debtor.

principal, that the Defendant owes the Plaintiff.

## Conclusion

The Plaintiff is entitled to a judgment determining that $28,750 is excepted from discharge pursuant to 11 U.S.C. § 523(a)(6). Counsel for the Plaintiff is directed to prepare an order consistent with this Opinion and the presentment of order procedures of this Court.

**Signed on January 25, 2016**

                                                **/s/ Daniel S. Opperman**
                                           **Daniel S. Opperman**
                                           **United States Bankruptcy Judge**